UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BAKUL DAVÉ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 3:18-cv-02122-GCS |
| ) | |
| BOARD OF TRUSTEES OF ) | |
| SOUTHERN ILLINOIS UNIVERSITY, ) | |
| CARBONDALE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. 83). Defendant, Board of Trustees of Southern Illinois University, Carbondale ("SIU"), filed its Motion along with a Memorandum of Law in Support on October 24, 2022. (Doc. 83, 84). In the Motion, Defendant contends that Plaintiff's claims under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act are "frivolous." (Doc. 84, p. 1). Defendant believes Plaintiff's termination was justified because he failed to fulfill his teaching obligations at the University. *Id.* at p. 2. On December 12, 2022, Plaintiff, Bakul Davé ("Davé"), filed a Response to Defendant's Motion for Summary Judgment. (Doc. 89). Davé argues that Defendant's Motion for Summary Judgment should be denied because he can point to evidence in the record that suggests Defendant's justification for termination amounted to pretext. (Doc. 89, p. 10-21). For the reasons delineated below, the Court **GRANTS** Defendant's Motion for Summary

Judgment. (Doc. 83)

BACKGROUND

Davé is a former faculty member at Southern Illinois University in Carbondale. (Doc. 84, Exh. 2, p. 2). Davé joined SIU in 1996 as a tenure track Assistant Professor in the Department of Chemistry and Biochemistry.[1] *Id.* Throughout his tenure, Davé taught inorganic chemistry classes. (Doc. 89, Exh. 1, p. 2). The classes that Davé taught at SIU included CHEM-410, CHEM-411, CHEM-479, and CHEM-579. (Doc. 84, Exh. 2, p. 2) He was promoted to the rank of Associate Professor in 2002. *Id.* Davé's responsibilities at the University included teaching courses, conducting research, and providing service. (Doc. 84, Exh. 39, p. 15).

Davé filed this lawsuit against SIU on November 26, 2018. (Doc. 1). In his Complaint, he alleges that Defendant's termination of his employment on June 5, 2017, violated his rights under the substantive provisions of Title VII of the Civil Rights Act of 1964 ("Title VII")[2], 42 U.S.C.A § 2000e-2(a), the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964 ("Anti-Retaliation Provision of Title VII")[3], 42 U.S.C.A.

---

[1]     The Department has since changed its name. It is now known as the School of Chemistry and Biomolecular Sciences.

[2]     In support of the Title VII allegations, Davé noted in his Complaint that he is Indian (national origin) and Asian. Davé stated that he believes he "has been discriminated against because of his national origin and race in that he has been subjected to harsher terms and conditions than other individuals employed by SIU, had his personal property taken, he was suspended without pay by SIU and he was terminated." (Doc. 1, p. 6).

[3]     In support of the Anti-Retaliation provision claim, Davé stated in his Complaint that the alleged retaliatory actions taken by SIU were: "(1) altering the terms and conditions of his employment, including his work space and teaching assignments in a way that would make it impossible for him to perform his job duties and in a way that would diminish his reputation in

§ 2000e-3, and the Age Discrimination in Employment Act ("ADEA")[4], 29 U.S.C.

§ 623(a)(1). Before pursuing the present litigation, Davé filed discrimination charges with

the Illinois Department of Human Rights, the Illinois Educational Labor Relations Board

("IELRB")[5], the U.S. Equal Opportunity Employment Commission ("EEOC")[6], and the

Appellate Court of Illinois[7]. Each of these actions resulted in outcomes favorable to SIU.

---

his field; (2) tak[ing] property that belonged to him personally and refus[ing] to return it to him; (3) suspend[ing] him without pay; (4) subjecting him to investigations that were not warranted; and (5) terminat[ing] his employment." (Doc. 1, p. 5).

[4]      In support of the ADEA claim, Davé states in his Complaint that he is over the age of 40. Moreover, Davé states that he believes he has been discriminated against because of his age in that "he has been subjected to harsher terms and conditions than other individuals employed by SIU, had his personal property taken, he was suspended without pay by SIU and he was terminated." (Doc. 1, p. 7).

[5]      In its Memorandum of Support of the Motion for Summary Judgment, Defendant notes that Davé previously filed the following cases against SIU and the Faculty Union:

- *Davé v. Southern Illinois University of Carbondale*, IELRB Nos. 18-CA-0005-C / 18 - CA-0039-C (IELRB dismissal of Plaintiff's claims against the University). (Doc. 84, Exh. 48)
- *Davé v. Bd. of Trustees of Southern Illinois University Carbondale,* IELRB No. 17-CA-0017-C (IELRB dismissal of Plaintiff's claims against the University). (Doc. 84, Exh. 47)
- *Davé v. Southern Illinois University Carbondale Faculty Association, IEA-NEA,* IELRB No. 18-CV-0009-C (IELRB dismissal of Plaintiff's claims against the Faculty Union). (Doc. 84, Exh. 46).

[6]      Davé filed two separate charges against SIU through the EEOC. He filed Charge No. 21B-2017-01201 on April 11, 2017, and Charge No. 440-2018-01047 on November 19, 2017. (Doc. 84, Exh. 2, p. 4). With respect to both, Davé alleged that "SIU had discriminated against him on the basis of his race, national origin, age, and in retaliation for engaging in protected activities." *Id.* On September 19, 2018, Davé received a right to sue notice from the EEOC as it relates to those charges. *Id.* at p. 5.

[7]      SIU also requests that the Court take judicial notice of the following Illinois Appellate Court decisions:

- *Davé v. State of Illinois Educ. Lab Rels. Bd.*, 2020 Il. App.1st 190148-U (Appellate decision affirming the IELRB's dismissal of Plaintiff's claims against the

A.      **Davé's 2014 Termination and Reinstatement at SIU**

In 2014, Davé's employment with SIU was terminated for the first time for the alleged sexual harassment of a student. (Doc. 84, Exh. 4, p. 10). Davé was a member of the SIUC Faculty Association, IEA/NEA ("Faculty Union") and was covered by a collective bargaining agreement ("CBA"). (Doc. 84, Exh. 42, p. 10-11; Exh. 40). The Faculty Union filed a grievance on Davé's behalf contesting his termination. (Doc. 84, Exh. 4). The grievance was denied, and the Faculty Union requested that the grievance be adjudicated through arbitration. *Id.* On December 1, 2015, an arbitrator found that SIU did not meet its burden to prove just cause for Davé's termination and ordered him to be reinstated. *Id.* The arbitrator indicated that Davé should be "reinstated to his position with back pay and all benefits that would have accrued but for his dismissal." (Doc. 84, Exh. 4, p. 31). Pursuant to the arbitration order, Davé returned to SIU to resume his professorship in January 2016.

1.      **Davé's Office and Lab Space**

Upon his return to SIU, Davé requested that the University assign him the same office and laboratory space that he had occupied prior to his termination. (Doc. 84, Exh. 5). On February 2, 2016, Deborah Nelson ("Nelson"), Senior Associate General Counsel for SIU, communicated with Davé's faculty union representative, Jim Clark ("Clark"),

---

University) (noting that "[t]he record shows that SIU placed him on administrative leave and terminated him because he failed to perform his assigned teaching duties in the Spring of 2017, not because he engaged in any protected activities.") (Doc. 84, Exh. 37)

- *Davé v. State of Illinois Educ. Lab. Rels. Bd.*, 2019 Il. App. 1st 182442-U (Appellate decision affirming the IELRB's dismissal of Plaintiff's claims against the University). (Doc. 84, Exh. 36).

regarding the request. In her email, Nelson indicated that the faculty members currently occupying Davé's former lab (Necker's Room 306/308/319) and office space (Necker's Room 316) had declined to voluntarily move. *Id.* As a result, the Interim University Provost, Dr. Susan Ford ("Ford"), assigned Davé Necker's Rooms 307/309 for his new laboratory space and Necker's Room 325 for his new office space.[8] (Doc. 84, Exh. 5). The spaces had identical dimensions to Davé's old office and lab space, with a substantially similar layout and were on the opposite side of the hall from his old spaces. (Doc. 84, Exh. 4, 5).

Through Clark, Davé contested his assigned lab space. (Doc. 84, Exh. 7, p. 1). Davé indicated that his research would be harmed if he was not returned to the same environment that his research was conducted in previously. *Id.* Ultimately, Ford concluded that a different lab and office assignment was not warranted because the assigned space would allow Davé to continue to perform his research. *Id.* at p. 2. Accordingly, Davé was instructed to pick up keys to those spaces and return to work on February 22, 2016. (Doc. 84, Exh. 7, p. 2).

On February 23, 2016, the arbitrator issued a clarification letter, stating that the University was not required to assign Davé the exact same space that he had previously

---

[8]     On January 21, 2016, Davé toured three options for lab and office space offered by the University with a union representative. However, Davé refused to choose any of the options presented to him. This resulted in the University assigning him to an office and lab. (Doc. 84, Exh. 6, p. 1).

    In her sworn affidavit, Interim Provost Ford indicated that she believed the assignment of workspace to Plaintiff was appropriate and she did not consider Davé's race, national origin, age, or prior complaints in any way when assigning space to him. (Doc. 84, Exh. 53, p. 1).

occupied to return him to the "*status quo ante* []" prior to his discharge.[9] (Doc. 84, Exh. 8, p. 1). Still, Davé continued to discuss his complaints with the Faculty Union regarding the University's office and lab assignment. *See generally* (Doc. 84, Exh. 31, 32). In the Spring of 2016, pursuant to Davé's complaints that his assigned office and lab space were making him ill, the SIU Center for Environmental Health and Safety ("CEHS") conducted an inspection of those spaces. (Doc. 84, Exh. 9, p. 2-3). While CEHS recommended that the ventilation system be adjusted slightly for humidity and the return air grills be cleaned, no other issues were identified. *Id.* at p. 3.

In subsequent letters to Davé, the Faculty Union analyzed his concerns regarding the assigned spaces and concluded that his arguments lacked merit. (Doc. 84, Exh. 33). In those letters, the Faculty Union admonished Davé for withholding medical documentation indicating that the spaces made him ill. *Id.* at p. 4. Moreover, the Faculty

---

[9]    Arbitrator Matthew Finkin clarified the meaning of *status quo ante*, in a subsequent order stating:

> This does not require the University to restore him to exact same laboratory or office that he occupied before he was discharged. He should be returned to a laboratory equivalently equipped for his research needs and given an office equivalently equipped for his teaching, research, and service obligations . . . the University has an obligation under my award to return Davé to the practice of his profession . . . My order does require the University to provide Dr. Davé with such space and such equipment, supplies, materials including chemicals as is necessary for the conduct of his work and that is convenient for his use . . . Dr. Davé shall provide the University administration with a list of the specific equipment, supplies, materials, and chemicals that he used prior to his discharge and that is necessary for the conduct of his future research.

(Doc. 84, Exh. 8). Arbitrator Finkin's message does not state whether the University was required to provide Davé with the same teaching assignments that he had received prior to his termination to return Plaintiff to the *status quo ante* prior to his discharge. *See generally* (Doc. 84, Exh. 8).

Union noted that some of the symptoms Davé complained of existed prior to him occupying the new spaces. *Id.* On May 18, 2016, Clark notified SIU in an email that Davé continued to "raise a number of arguments as to why he should be reassigned back to his former office and lab space" and that "[w]e have advised him we believe that issue was fully and finally resolved by the Arbitrator, an answer he refuses to accept and, which limits our ability to assist him or advocate for him on this and other related issues." (Doc. 84, Exh. 11).

### 2.   Davé's Complaints about his Personal Items

After his 2014 termination, the Department's Office Manager – Andrea Steen, instructed Davé to clean out his office and retrieve any personal items. (Doc. 84, Exh. 19). Davé failed to do so. (Doc. 84, Exh. 56). In the Summer of 2015, more than a year after Davé was terminated, department personnel cleaned out the office and lab spaces so that they could be reassigned to other faculty members. (Doc. 84, Exh. 56); (Doc. 84, Exh. 43, p. 50). Many of the items were not usable or needed by the institution and were thus discarded. (Doc. 84, Exh. 56); (Doc. 84, Exh. 44, p. 50-59). Various other items were retained in boxes or put into use by other faculty in the Department. *Id.* Davé was notified that he could pick up these boxes from the Department. (Doc. 84, Exh. 44, p. 49). However, he refused to pick up the boxes, claiming that the collection of items constituted "theft and larceny," of his property and the boxes of items constituted evidence. (Doc. 84, Exh. 35); (Doc. 84, Exh. 40, p. 85); (Doc. 84, Exh. 32).

After Davé was reinstated, the then-chair of the Department, Dr. Gary Kinsel

("Kinsel"),[10] sent an email to all departmental faculty requesting that any equipment or other items from Plaintiff's prior office or lab space be returned. (Doc. 84, Exh. 56); (Doc. 84, Exh. 44, p. 47-49).

Throughout the Spring of 2016, Davé complained that he could not resume his work at SIU because equipment, supplies and other items had been removed from his old office and lab space.[11] (Doc. 84, Exh. 35); (Doc. 84, Exh. 33). In the clarification letter dated February 23, 2016, the arbitrator indicated that Davé shall provide the University administration with a list of specific equipment, supplies, materials, and chemicals that he used prior to his discharge that are necessary for the conduct of his future research. Additionally, the arbitrator noted that if Davé provided the University with a specific list of personal items that he believes were removed from his previously assigned office, the University should make a good faith effort to have such personal items returned to him. (Doc. 84, Exh. 8).

In February 2016, Davé submitted a "partial, preliminary and provisional" list of books, but otherwise failed to submit lists of items to the University as ordered by the arbitrator. On April 27, 2016, the University sent an email to Clark giving Davé until May 10, 2016, to submit the lists. (Doc. 84, Exh. 12). Clark then requested an extension of the

---

[10]    Kinsel served as chair of the Department from 2007 to August 2016. (Doc. 84, Exh. 29, p. 2).

[11]    In her sworn affidavit, Interim Provost Ford indicated that she honestly believed that the University appropriately handled Davé's requests regarding his personal property and that she did not consider his race, national origin, age, or prior complaints in handling the requests regarding his personal property. (Doc. 84, Exh. 53, p. 1).

deadline until May 17, 2016, which the University granted. (Doc. 84, Exh. 13).

Davé continued to complain about his missing equipment, supplies and other items with the Faculty Union. In a subsequent letter to Davé, the Faculty Union concluded that Davé's concerns lacked merit, stating:

> As you know, the Arbitrator required the University to take certain steps – but only after you took certain steps, described more clearly in the Supplemental Award. Your response to the Grievance Committee's original merit assessment ignores those obligations placed upon you in the Supplemental Award to "provide the University administration with a list of the specific equipment, supplies, materials, and chemicals that [you] used prior to [your] discharge and that is necessary for the conduct of [your] future research."
>
> There is evidence that you failed to do what was required of you, relieving the University of fully doing what was required of it. You never completed a specific request for the books, equipment or other resources that you needed for your work, and never sought to reestablish your lab, including the replacement of equipment, supplies, etc. Yet, you argue that you could not prepare for the courses as you lacked a computer. However, it was up to you to tell the University what you needed, within the existing limitations. Inexplicably, you did not complete even this simple task.

(Doc. 84, Exh. 33, p. 3).

On May 18, 2016, Clark informed the University via email that Davé "refused to accept" the fact that the arbitrator had fully resolved the questions surrounding the terms of his reinstatement at the University. (Doc. 84, Exh. 11). The faculty representative indicated that the Faculty Union had informed Davé that he should "communicate directly with… SIUC officials in regard to matters relating to equipping and supplying his lab." *Id.*

**B.** **Davé's Complaints about his Teaching Assignments & his Refusal to Teach**

Teaching assignments at SIU are governed by the SIUC Collective Bargaining Agreement ("CBA"). (Doc. 89, Exh. 2). Pursuant to Article 8 of the CBA, the "Chair/Director (or equivalent)" of each university department is responsible for making the workload assignments for faculty members, subject to approval by the Dean. (Doc. 89, Exh. 2, p. 116-117). In making faculty workload assignments, the CBA dictates that the Chair/Director should consider the following primary factors in making workload assignments: "students' needs, the unit's needs, the faculty member's expertise, interest and developing needs (including a Faculty member's interest in seeking tenure and promotion), and the equitable distribution of workload within the department." *Id.* at p. 117. Moreover, the CBA indicates that "[c]hanges in a final workload assignment can only be made for a subsequent change in circumstances (*e.g.*, death or disability of a Faculty member, employment of new Faculty, the closing of previously scheduled courses, level of external funding from grants, increase or decrease in enrollment of assigned courses, reduction in total revenue, etc.)." (Doc. 89, Exh. 2, p. 117).

In anticipation of Davé's return, SIU prepared his draft workload assignment for Spring 2016. (Doc. 89, Exh. 2, p. 83). Nelson forwarded the draft assignment to Clark on January 11, 2016. *Id.* Clark then forwarded Davé's response to the draft workload assignment to Nelson. *Id.* Davé pointed out that the Chair of the Department had failed to discuss the assignment with him and that he was the only faculty member with expertise in inorganic chemistry. *Id.* at p. 82. Davé also noted that he had not taught CHEM 106 before and believed that the assignment "may be a case of differential

treatment and/or retaliation." *Id.* at p. 83. Clark stated the following when forwarding

Davé's response:

> I agree that there is a meeting with the Chair and Davé initiated by the Chair
> to discuss the assignment. Kinsel needs to call Davé and meet about this
> issue. Davé asserts that absent his dismissal he would have been assigned
> a course other than 106 per his recent history of assignments especially since
> he created 411. Also under Article 8 Faculty expertise is a criteria for
> assignments. Also under Article 8 a change in circumstances can trigger a
> change in assignments in the context that while it might be problematic to
> reverse another Faculty member's assignment Finkin's [arbitration] order
> falls into that category. SIU must change this assignment and offer Davé
> a[n] assignment consistent within the Arbitrator's order and the CBA. *We
> need a different option other than this assignment.*

(Doc. 89, Exh. 2, p. 82).

After his reinstatement at SIUC, Davé met with Kinsel on April 29, 2016, to discuss

his workload assignment for Spring 2016 and Fall 2017. (Doc. 84, Exh. 42, p. 15); (Doc. 42,

Exh. 14). During that meeting, Davé claims that he advised Kinsel that he wished to teach

the same courses that he had been teaching "for decades," CHEM 410-411. (Doc. 89, Exh.

2). Kinsel reportedly told Davé that he was giving preference to younger faculty members

and would likely be assigning them these inorganic chemistry courses.[12] (Doc. 84, Exh.

41, p. 37:13-38:6). Davé alleges that the faculty member who was assigned to teach CHEM

410-411, Dr. Moran, did not meet the ACS accreditation requirements to teach the course.

(Doc. 89, Exh. 1, p. 5).

---

[12]     The faculty member assigned to teach Chemistry 410 and 411 was a newer faculty
member, Dr. Moran, who had taught the course the previous year. (Doc. 84, Exh. 43, p. 60: 1- 61:5).
Kinsel reports that he explained to Davé that he did not want to displace this new faculty member
and force him to develop new course materials. *Id.* Kinsel notes this is standard departmental
practice, such that non-tenured faculty members can make progress towards obtaining tenure. *Id.*

Kinsel contends that Davé was then provided with a copy of his workload assignment for the 2016-2017 school year. (Doc. 84, Exh. 42, p. 17:23-18:1). Documentation shows that Davé was assigned two classes during the 2016-2017 academic year, *i.e.*, CHEM-579[13] in Fall 2016, and CHEM-106[14] in Spring 2017. (Doc. 84, Exh. 14). Davé was also assigned to supervise graduate and undergraduate student research, conduct his own chemical research, and engage in service activities at the University including journal editorship and coaching the inorganic/materials chemistry team. *Id.* Kinsel signed the document on April 29, 2016. *Id.* Dean Laurie Achenbach ("Achenbach") approved the assignment on May 24, 2016. *Id.* According to Kinsel, Davé refused to sign the workload assignment document, and the assignment was emailed to Clark on August 29, 2016, by Nelson. (Doc. 84, Exh. 16). Davé alleges that he did not see the document until it was mailed to Nelson on that date. (Doc. 89, Exh. 1, p. 5)

Dr. Lichang Wang ("Wang") started as the new Chair of the Department in August 2016. (Doc. 84, Exh. 57). On August 28, 2016, Wang met with Davé and Dr. Punit Kohli ("Kohli") for several hours at a Panera Bread restaurant to discuss Davé's workload assignment and other departmental issues. (Doc. 84, Exh. 18, p. 1). Wang's account of the meeting and Davé's account of this meeting differ.

Wang sent an email to Nelson on August 29, 2016, recounting the meeting with Davé and Kohli. (Doc. 84, Exh. 18). Wang stated that she informed Davé that the courses

---

[13]     CHEM 579 is an advanced chemistry course. (Doc. 84, Exh. 42, p. 21:1-4). Davé had previously taught CHEM 579. *Id.* at p. 13:10-14.

[14]     CHEM 106 is an introductory course for non-science majors. (Doc. 84, Exh. 21, p. 21:12-13). Davé had never taught the course at SIU. *Id.* at. p. 21:8-13.

assigned by Kinsel would not be changed and that Davé would be expected to teach his assigned courses. (Doc. 84, Exh. 18, p. 1). Davé then allegedly told Wang that he could not teach CHEM 579 without his notes, syllabus, and other materials that had been in his old office. *Id.* Wang also reported that she told Davé that she would attempt to retrieve any lecture notes for his assigned courses and then offered to cancel CHEM 579 for Fall 2016 to allow Davé additional time to prepare his teaching materials. *Id.* at p. 2. Davé, on the other hand, alleges that Wang agreed with him that "it did not make sense for [Davé] to teach CHEM-106 when [he] told her that the ACS accreditation requirements for CHEM 410-411 were not met by Dr. Moran." (Doc. 84, Exh. 1, p. 5). Davé also disagrees with Wang's assertion that she made it "crystal clear" that he could not teach CHEM 410-411 unless the faculty member teaching the course did not want to teach them. (Doc. 84, Exh. 42, p. 29:10-30:21).

Wang then discussed the potential course cancellation with Achenbach. (Doc. 84, Exh. 57, p. 2); (Doc. 84, Exh. 18, p. 2). On the evening of August 29, 2016, Wang emailed Davé to update him on her discussion with Achenbach. (Doc. 89, Exh. 2, p. 88). Wang noted that Achenbach agreed to cancel CHEM 579 for the semester and proposed a new teaching assignment for Davé. *Id.* Wang proposed that Davé teach "Fall 2016: None . . . Spring 2017: CHEM 579 (hopefully you will have enough time to recreate the materials) . . . But I can only do so if I can find someone to cover CHEM 106 . . . I am counting on Punit [Kohli]." *Id.* Wang then asked if teaching CHEM 579 in Spring 2017 would be acceptable to Davé. *Id.* After signing off in the email, Wang wrote "PS: Let's hope Punit is not going to do his sabbatical." *Id.*

On August 30, 2016, SIU cancelled CHEM 579 for Fall 2016, citing to low student enrollment. (Doc. 84, Exh. 57, p. 2); (Doc. 84, Exh. 20). On September 14, 2016, Wang issued a revised workload assignment reflecting that change to Davé.[15] (Doc. 84, Exh. 22); (Doc. 84, Exh. 23, p. 2-3). Wang provided Davé with a memo containing the old and new assignment and requested that he return the revised assignment to her with his signature. (Doc. 84, Exh. 22). Davé's new teaching assignment eliminated CHEM 579 from the Fall 2016 assignment and included CHEM 106 as well as CHEM 579 in the Spring 2017 assignment. *Id.* at p. 3. The remainder of Davé's responsibilities were left unchanged. *Id.* The form was not signed by either Wang or the Dean. (Doc. 84, Exh. 22, p. 3). Davé responded to Wang's reassignment email with the following:

> I tried to outline my concerns with the assignment but those have been neglected, ignored, and rejected. I have not taught chem 106 before and it is not clear why it is being assigned to me. I have been teaching chem 411 since 1996, it is my area of expertise and there is no reason for a change. Initially you agreed that I should be teaching chem 411 but now, after talking to other people in the administration, you have reverted back.

> Because it is the course I would like to teach. I asked to teach it last spring and again I requested that course in the meeting with ex-chair in May but it has not been assigned to me. I have filed several complaints and just initiated another grievance on the matter.

> I, once again, reiterate my request for Chem 411.

(Doc. 84, Exh. 23, p. 2).

---

[15]     Wang honestly believes that she appropriately assigned classes to Davé to teach, and that he failed to fulfill his teaching obligations in the Spring of 2017. (Doc. 84, Exh. 57, p. 3). Wang did not consider Davé's race, national origin, age, or prior complaints in assigning any classes for him to teach. *Id.*

Davé then filed a grievance with Dean Achenbach that very same day, contesting his revised workload assignment. (Doc. 89, Exh. 2, p. 90). Section 8.02 of the CBA allows a faculty member to file grievances that challenge their teaching assignments. (Doc. 89, Exh. 2, p. 118). "Any such grievance shall be given priority in order to expedite resolution." *Id.* In accordance with Section 6.09 of the CBA, Davé also requested numerous forms of university documentation pertaining to his workload assignment.[16]

---

[16]    The following is the list of documentation that Davé requested:

1.      Copies of all communications (including hard copy and/or electronic communications) since December 01, 2015 received by the office of SIU legal from anybody within the university, and/or from anybody outside the university (including SIUCFA-IEA) regarding any aspect related to my workload assignment.

2.      Copies of all communications (including hard copy and/or electronic communications) since December 01, 2015 sent by office of SIU legal to anybody within the university, and/or to anybody outside the university (including SIUCF A-IEA) regarding any aspect related to my workload assignment.

3.      Copies of all communications (including hard copy and/or electronic communications) since December 01, 2015 received by office of Provost and associate provost from anybody within the university, and/or from anybody outside the university (including SIUCF A-IEA) regarding any aspect related to my workload assignment.

4.      Copies of all communications (including hard copy and/or electronic communications) since December 01, 2015 sent by office of Provost and associate provost to anybody within the university, and/or to anybody outside the university (including SIUCF A-IEA) regarding any aspect related to my workload assignment.

5.      Copies of all communications (including hard copy and/or electronic communications) since December 01, 2015 received by COS Dean from anybody within the university, and/or from anybody outside the university (including SIUCF A-IEA) regarding any aspect related to my workload assignment.

6.      Copies of all communications (including hard copy and/or electronic communications) since December 01, 2015 sent by COS Dean to anybody within the university, and/or to anybody outside the university (including SIUCFA-IEA) regarding any aspect related to my workload assignment.

7.      Copies of all communications (including hard copy and/or electronic communications) since December 01, 2015 received by Chemistry chair from anybody within the university, and/or from anybody outside the university

Section 6.09 of the CBA indicates that "the party to whom the request is made shall respond in writing within 10 days as to whether or not the request will be honored in whole or in part . . . ." (Doc. 89, Exh. 2, p. 113). Achenbach forwarded Davé's email to Nelson, stating "And so it begins. How do you wish me to proceed." (Doc. 89, Exh. 2, p. 90). Davé alleges that he never received a response back to this grievance. (Doc. 89, Exh.

---

(including SIU CF A-IEA) regarding any aspect related to my workload assignment.

8. Copies of all communications (including hard copy and/or electronic communications) since December 01, 2015 sent by Chemistry chair to anybody within the university, and/or to anybody outside the university (including SIUCF A-IEA) regarding any aspect related to my workload assignment.

9. List of all graduate courses offered by the department of chemistry since 2010 showing the first week enrollment for each course.

10. Course number, section, and name of instructor for courses cancelled by the department since 2010 where the enrollment was three (3) students

11. Course number, section, and name of instructor for courses cancelled by the department since 2010 where the enrollment was two (2) students.

12. Course number, section, and name of instructor for courses cancelled by the department since 2010 where the enrollment was one (1) student.

13. List of Meeting time (dd/mm/yy) when chair of chemistry met with each faculty member in the chemistry department to discuss their assignment for the spring 2016 semester.

14. List of Meeting time (dd/mm/yy) when chair of chemistry met with each faculty member in the chemistry department to discuss their assignment for the fall 2016/ spring 2017 semester.

15. Copies of final workload assignments (including copies of initial assignments in case the final assignment was different) showing the workload assignment for spring 2016 semester as approved by Dean for all faculty members in the department of chemistry.

16. Copies of final workload assignments (including copies of initial assignments in case the final assignment was different) showing the workload assignment for fall 2016-spring 2017 semesters as approved by Dean for all faculty members in the department of chemistry.

17. Copies of salukinet records for the months of May, June, July, August, and September 2016 showing record of the courses assigned to me for fall 2016 semester. Alternatively, any other records that show courses assigned to me for the fall 2016 semester and any changes in them during the period from April 2016 to September 2016.

1, p. 7). Further, he alleges that he never received the information he requested under Section 6.09 of the CBA. *Id.*

On January 13, 2017, four days before the start of the Spring 2017 semester, Davé sent an email to Wang that stated: "I had asked for teaching inorganic course but was not assigned that. To date I have not been provided anything to be able to perform my duties. I[n] view of these, I would not be in a position to teach." (Doc. 84, Exh. 25, p. 2). On January 17, 2017, Davé sent another email to Wang that stated, "I sent both you and Punit on jan 13 at 4:42 PM CST a formal notification (see below) that I would not be in a position to be able to teach because I have not been provided any resources." *Id.* at p. 1.

A "day or two before the semester started," Davé also claims that he received a phone call from Kohli during which Kohli reportedly told him that Wang had assigned Davé's courses to him to teach for Spring 2017. (Doc. 84, Exh. 42, p. 49:16-20, 51:2-12). Kohli was reportedly asked by Wang to relay the news to him because of "some shit from DiLalla." *Id.* at p. 49:1-5. Davé did not follow up with Wang after this communication from Kohli. *Id.* at p. 60:8-11. This conversation did not surprise Davé considering Wang's email communications with him from August 2016. (Doc. 89, Exh. 1, p. 8).

Based on the most recent contents of the email communications between Wang and Davé, Wang emailed Achenbach informing her that Davé refused to teach CHEM 106 and CHEM 579. (Doc. 89, Exh. 2, p. 92). Wang proposed options "to take care of [the] two courses" including making temporary arrangements for class coverage and requesting SIU to hire a "1/3 lecturer" to teach CHEM 106. (Doc. 89, Exh. 2, p. 92). Achenbach replied to Wang, indicating that she "spoke with Davé and his

recommendation is to NOT put a replacement into either course until Dr. Davé does not show up to class. Please see me asap to discuss." *Id.*

Davé did not show up to teach the first day of his assigned courses during the Spring 2017 semester. (Doc. 84, Exh. 57, p. 2). Students arrived on the first day of the semester to an empty classroom without the assigned professor. *Id.* at p. 3. Wang was made aware of the situation and took actions to address the lack of a professor in the classroom. *Id.*; (Doc. 84, Exh. 26). The University was then forced to expend considerable time, energy, and resources to cover Davé's assigned course load. *Id.*

### C.     Davé's Termination

On January 19, 2017, Davé was placed on unpaid administrative leave pending an investigation, in accordance with the CBA. (Doc. 84, Exh. 27). On January 20, 2017, SIU initiated a formal investigation. (Doc. 84, Exh. 29). Dr. David DiLalla, Associate Provost for Academic Administration, and Nelson were assigned as investigators. *Id.* The investigators collected documents and conducted interviews of various individuals, including Davé. *Id.*

On March 20, 2017, the investigators issued an Investigatory Report, which concluded that Davé was assigned to teach CHEM 106 and CHEM 579 in the Spring of 2017, that Davé knew about this assignment, and that Davé did not perform his assigned teaching duties. (Doc. 84, Exh. 29). The report noted that Davé alleged that he could not teach the course unless his previous course materials were returned to him. *Id.* The report stated that Davé previously taught CHEM 579, the Department Chair made efforts to obtain his previous course materials for this course, he was qualified to "re-develop" and

teach the course, and he had sufficient time to do so. *Id.* The report stated that CHEM 106 was a chemistry course for non-science majors, that Plaintiff was qualified to teach the course, and that he had been offered previously developed materials for this course. *Id.* Ultimately, the investigators recommended moving forward to discipline. *Id.* Ford concurred. (Doc. 84, Exh. 31).

Davé was notified of the investigators' decision, provided a copy of the Investigatory Report, and a disciplinary meeting was held on May 18, 2017. Davé was present at the meeting with Faculty Union representatives. After the meeting, the investigators submitted a memorandum to Ford recommending Davé's termination based on his refusal to teach his assigned courses. DiLalla and Nelson honestly believed that Davé's failure to teach his classes warranted discipline and neither of them considered Davé's race, national origin, or age, or prior complaints in recommending termination for his failure to fulfill his teaching obligations. (Doc. 84, Exh. 54, 55).

Davé was terminated on June 5, 2017, after Ford agreed with the investigators' recommendation. (Doc. 84, Exh. 31). Ford's decision to terminate Davé was solely based on the fact that he refused to teach his assigned courses for Spring 2017. (Doc. 84, Exh. 53). Ford did not consider Davé's prior complaints, race, national origin, or age when making the decision. The basis of the decision was communicated to Davé in a letter dated June 5, 2017. The letter stated:

> I have carefully and deliberately reviewed all information presented to me regarding this case, including the notification of potential discipline, investigation report with supporting exhibits, and the discipline hearing report. I concur with the conclusion of Ms. Nelson and Dr. DiLalla that you refused to teach CHEM 106 and CHEM 579, two courses that were part of

your fully-executed Spring 2017 workload assignment. Your actions had significant and substantial negative impact on the Department of Chemistry, the College of Science. By refusing to perform your Spring 2017 teaching assignment, you failed to discharge your most basic responsibilities to your students and to the University.

(Doc. 84, Exh. 31).

Davé subsequently requested that the Faculty Union pursue a grievance on his behalf challenging the termination. On July 12, 2017, the Faculty Union sent Davé an email with an attached letter titled, "Merit Assessment – Bakul Davé". (Doc. 84, Exh. 32). In that letter, the Faculty Union analyzed each of Davé's arguments and concluded that, "the faculty association does not believe that a meritorious challenge can be made given the facts and circumstances of the case." *Id*. at p. 4. Thus, the Faculty Union declined to file a grievance challenging Davé's dismissal. *Id.*

Regarding Davé's claims about his workload assignment, the Faculty Union noted the following:

We have reviewed various emails provided by you which clearly show that Department Chair Wang advised you of the assignment to teach these two classes. That same email chain captures your refusal to teach these two courses. [. . .] You were repeatedly advised that you were placing your employment in jeopardy by refusing to teach the assigned courses. Regrettably, our advice was not followed. Notwithstanding your various unsupportable assertions, it is undisputed you failed or refused to teach these two classes.

(Doc. 84, Exh. 33, p. 1).

The Faculty Union also addressed Davé's allegations of retaliation and discrimination stating:

You have asserted the assignment constituted discriminatory treatment of you based on your age. While it is clear that you are in the protected age

category (40+) there is no evidence whatsoever that the University assigned you these courses because of your age, a necessary element to establishing age-based discrimination.

You have asserted that the assignments of CHEM 106 and CHEM 579 were somehow evidence of disparate treatment of you. Leaning on this assertion, you contended that by agreeing to the assignment, it would cause you to be in violation of the anti-discrimination laws. This is a preposterous argument and one that the FA advised you against relying upon as it would place your employment in peril.

[ . . . ]

You assert that because you had taught the same course since 1996, any change to your assignment would represent discrimination, harassment, and retaliation. You do not specify which of these protected classes you contend applies. However, as the FA has stated to you before, the University exercised its authority under the contract to assign you to teach different classes. As you are aware, other faculty members periodically experience changes in their assignments. Finally, other than the changed-assignment assertion, you have offered no evidence to establish discrimination, harassment, or retaliation.

(Doc. 84, Exh. 33, p. 2-3).

On October 6, 2017, Faculty Union President, David Johnson, then sent Davé another email and letter reiterating the various reasons why the Faculty Union concluded that Davé's dismissal was justified. (Doc. 84, Exh. 34). The letter concludes with the following statement:

The teaching of assigned classes is a central requirement of the faculty duties each professor is expected to perform. Teaching these particular courses was a primary duty for you for the spring semester in the 2016-2017 academic year. Your refusal to teach these classes is undisputed. Each of your defenses fails to mitigate your obligation to teach these courses. As such, we have concluded, at each step, that a grievance challenging your dismissal lacks merit.

(Doc. 84, Exh. 34, p. 6).

LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence and determine the truth of the matter[,]" it must ascertain whether a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*,

477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

DISCUSSION

**A.    Davé's Attempts at Exhaustion Under Title VII and the ADEA**

As an initial matter, SIU argues that Davé's Title VII claims should be dismissed for failure to exhaust administrative remedies. (Doc. 84, p. 24-26). SIU advances two separate grounds under which Davé failed to exhaust. *Id.* First, SIU argues that Davé failed to file charges with the EEOC within 300 days of the alleged unlawful employment event in accordance with the enforcement provisions of Title VII. *Id.* at p. 25-26. SIU's argument equally applies to Davé's ADEA claims. *See, e.g., Flannery v. Recording Industry Ass'n of America*, 354 F.3d 632, 637 (7th Cir. 2004) (noting that an employee must sue under

the ADEA within 300 days of the unlawful employment practice). Thus, the Court will conduct an exhaustion analysis of Davé's Title VII and ADEA claims.

A party who wishes to bring a Title VII or ADEA claim in federal court must first file an administrative charge with the EEOC within 300 days of the allegedly unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d). That is, the plaintiff "must first exhaust his administrative remedies by filing charges with the EEOC and receive a right to sue letter." *See Carr v. Chicago Bd. Of Education*, No. 19-cv-7275, 2023 WL 6520348, at *3 (N.D. Ill. Oct. 4, 2023) (citing *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019). Exhaustion is neither a jurisdictional prerequisite nor an essential element of a Title VII or ADEA claim, but a condition precedent to bringing a claim under each act. *See, e.g., Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009) (noting that exhaustion is a condition precedent to a plaintiff bringing a claim under Title VII). *See also Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 527 (7th Cir. 2003) (stating that "[i]n order to bring an ADEA claim in federal court, a plaintiff must have raised it in a timely EEOC charge.").

Analyzing when the 300-day statute of limitation has begun to toll is not a straightforward question. *See Williams v. Whitley Memorial Hospital, Inc.*, Case No. 3:21-CV-892 JD, 2023 WL 6064933, at *8 (N.D. Ind. Sept. 18, 2023). The Supreme Court has held that the continuing violation doctrine can reset the clock based on repeated employer violations. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114-115 (2002). Such is the case when the alleged misconduct is a part of a single unlawful employment practice. *See Lucas v. Chicago Transit Authority*, 367 F.3d 714, 723 (7th Cir. 2004). In those

instances, acts that fall outside of the statute of limitations may be saved by those acts that occur within the filing period. *Id.* However, discrete discriminatory acts, such as "termination, failure to promote, denial of transfer or refusal to hire" restart a new clock for filing charges on the date the subsequent discrete act occurred. *See National Railroad Passenger Corp.*, 536 U.S. at 113-114. Davé's allegations regarding his workspace assignment, the return of his personal property, his workload assignments (both the initial assignment and assignment revision), his suspension without pay, and ultimate termination are all discrete discriminatory acts. Thus, Davé may not use the continuing violation doctrine to save his claims.

However, Davé asserts that his EEOC complaint dated April 11, 2017, is a perfected version of an EEOC complaint previously submitted in December 2016. *See, e.g.*, (Doc. 1, p. 4) (stating that "[o]n April 11, 2017, Davé perfected a charge of discrimination with the Illinois Department of Human Rights and EEOC (Charge No. 21B-2017-01201) that alleged that SIU had discriminated against him on the basis of his race, national origin, age and in retaliation for engaging in protected activities."). According to EEOC Regulation § 1601.12, "[a] charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge *will relate back to the date the charge was first received.*" 29 C.F.R. § 1601.12. SIU has failed to supply the Court with the December 2016 EEOC charging document. This would have allowed the Court to apply the relation back doctrine with precision. However, as

SIU bears the burden of demonstrating the affirmative defense of failure to exhaust administrative remedies, the Court must view the record in the light most favorable to plaintiff and apply the relation back doctrine to those discrete acts that were likely included in the December 2016 charging document.

Davé's workspace assignment was provided to him on February 6, 2016. (Doc. 84, Exh. 6, 7). Davé was instructed to retrieve his personal items after his first termination by the chemistry department's office manager on June 2, 2014. (Doc. 84, Exh. 19). Davé received his initial workload assignment from Kinsel for the 2016-2017 academic year on April 29, 2016. (Doc. 84, Exh. 14, 15). He then received his revised workload assignment from Wang on September 14, 2016. (Doc. 84, Exh. 22, 23). Davé's suspension without pay began on January 19, 2017. (Doc. 84, Exh. 27). Lastly, Davé was terminated on June 5, 2017. (Doc. 84, Exh. 31). Davé's two EEOC charges were filed on April 11, 2017, and November 19, 2017, with the April 11, 2017, charge relating back to December 2016. (Doc. 84, Exh. 49, 50). Thus, Davé's allegations of unlawful conduct that occurred before March 6, 2016, are time barred.[17] Accordingly, Davé's allegations regarding his personal items is the only claim that does not survive.

SIU next argues that Davé's failure to have a notary public sign the November 19, 2017, EEOC Complaint (EEOC Charge Number 440-2018-01047) "makes the charge . . .

---

[17]    The 300-day calculation for each of the alleged discrete discriminatory acts are as follows: Davé's work space assignment – December 2, 2016; Davé's personal property – March 29, 2015; Davé's initial 2016-2017 workload assignment – February 23, 2017; Davé's revised 2016-2017 workload assignment – July 11, 2017; Davé's suspension without pay – November 15, 2017; and Davé's termination – April 1, 2018.

defective" as unverified under Title VII.[18] (Doc. 84, p. 26). While this may be a flaw, it is nowhere near a fatal one. In fact, a sister court within the Seventh Circuit, considered this argument "sanctionable" as being "without merit." *Kastel v. Winnetka Bd. of Educ., Dist. 36*, No. 96 C 1008, 1996 WL 648718, at *1 (N.D. Ill. Nov. 4, 1996). *See also Howard v. Board of Educ. Of Sycamore Community Unit School Dist. No. 427*, 876 F.Supp. 959, 971 (N.D. Ill. 1995).

According to the regulations applicable to Title VII charges filed with the EEOC, the term "verified" means "sworn to or affirmed before a notary public, designated representative or the Commission, or other person duly authorized by law to administer oaths, take acknowledgments, *or supported by an unsworn declaration in writing under penalty of perjury*." 29 C.F.R. § 1601.3(a) (1996) (emphasis added). Davé did sign the EEOC Complaint dated November 19, 2017, under penalty of perjury. (Doc. 84, Exh. 49, p. 1). Thus, Davé's claims regarding his workload assignment (both initial and revised), his suspension without pay, and termination may proceed.

## B.   Davé's Title VII and ADEA Claims

### 1.   *Title VII Discrimination Claim*

Davé has advanced two separate claims under Title VII. First, Davé alleges that he was discriminated against on the basis of his national origin and race in that he was subjected to harsher terms and conditions than other individuals employed by SIU, had

---

[18]   Unlike Title VII, the ADEA does not require a charge to be filed under oath or affirmation. *See, e.g.*, *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 543 n.1 (7th Cir. 1988) (noting the contrast between Title VII's verification requirement and the ADEA's verification requirement).

his personal property taken, was suspended without pay, and was terminated. (Doc. 1, p. 6). Second, Davé alleges that he was retaliated against for engaging in a protected activity, namely for filing complaints with the EEOC and the Faculty Union regarding his workload assignments, space assignment, and missing property. Davé alleges the retaliation included: "(1) altering the terms and conditions of his employment, including his work space and teaching assignments in a way that [made] it impossible for him to perform his job duties and in a way that would diminish his reputation in the field; (2) tak[ing] property that belonged to him personally and refus[ing] to return it to him; (3) suspend[ing] him without pay; (4) subject[ing] him to investigations that were not warranted; and (5) terminat[ing] his employment." (Doc. 1, p. 5). The Court will address both of Davé's Title VII claims in turn.

Regarding the claim of discrimination under Title VII, Davé believes that he does not need to establish a prima facie case of discrimination because SIU supposedly conceded the argument. (Doc. 89, p. 9). Davé cites to precedent from the D.C. Circuit in support of this proposition, wherein the court noted that "the district court need not – and should not – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*" where an employee has suffered an adverse employment action and an employer has asserted a legitimate non-discriminatory reason for the decision. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). However, SIU did not concede the argument that Davé has established a prima facie case of discrimination. SIU argues that Davé did not suffer a "materially adverse action" under Title VII and further argues that he is unable to prove that he was "terminated or suspended because of his

race or national origin." (Doc. 84, p. 22-23). Accordingly, the Court will consider whether Davé has established a prima facie case of discrimination under Title VII.

The substantive provisions of Title VII prohibit employers from discriminating on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). While the Seventh Circuit has tried to do away with the distinction between direct and indirect methods of proving employment discrimination, a plaintiff may still prove their case under either method. *See, e.g., Igasaki v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) (noting that a plaintiff may offer direct and/or circumstantial evidence of discrimination, and "all evidence belongs in a single pile and must be evaluated as a whole."). Regardless of the method chosen, courts should conduct their analysis by asking "whether a reasonable jury could find that the relevant decision was motivated in part by an unlawful criterion." *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022).

Here, Davé attempts to prove his case by using the indirect method. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff in a Title VII race discrimination suit must first establish a prima facie case of discrimination by showing (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees who were not members of his protected class were treated more favorably. *See Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). Once a prima facie case has been established, "the burden shift[s] to the defendant to 'articulate

a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (overruled on other grounds)).

Davé fails to establish a prima facie case of discrimination for his allegations regarding his suspension without pay and subsequent termination. In cases where a plaintiff alleges discriminatory disciplinary action, the second element (whether the employee was meeting the employer's legitimate expectations) typically merges with the fourth element (whether similarly situated employees who were not members of the protected class were treated more favorably). *See Luster v. Illinois Dept. of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011) (citing *Casket v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir 2008)). While Davé is correct in noting that Federal employment discrimination laws also protect employees who misbehave or perform poorly, this does not excuse a plaintiff from meeting their burden of demonstrating to the Court that his employer intentionally disciplined him more severely on the basis of his protected class. *Id. See also Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011) (noting that "perfection is not a requirement under Title VII"). Here, Davé has failed to offer the Court any comparator evidence to suggest that other similarly situated individuals, who were not in a protected class, were treated more favorably than him. Davé instead jumps the gun and only offers evidence of pretext without demonstrating he was treated more unfavorably than individuals who were not members of a protected class. Hence, Davé's Title VII discrimination claims regarding his termination and suspension fail.

Davé also fails to establish a prima facie case because he cannot show that he suffered a "materially adverse employment action." *See Lewis v. City of Chicago*, 496 F.3d 645, 652-653 (7th Cir. 2007). An adverse employment action "has been defined quite broadly in this circuit." *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008). The Seventh Circuit has recognized that it is "impossible" to create a "precise list of activities that constitute adverse employment actions," and whether an act is adverse depends on the "unique circumstances of individual cases." *Id.* Nevertheless, an adverse employment action must be "materially adverse, 'meaning more than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)). *See also Lewis v. Wilkie*, 909 F.3d 858, 870 (7th Cir. 2018) (stating that "not everything that makes an employee unhappy is an actionable adverse action."); *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (noting that a materially adverse employment action is one where the plaintiff suffers a "significant change in employment status."). Some examples of adverse employment actions include termination, suspension, demotion evidenced by a decrease in wage or salary, denial of a raise or fringe benefits, less distinguishable title, material loss of benefits, significantly reduced material responsibilities, and unbearable changes in job conditions such as a hostile work environment. *See Atanus*, 520 F.3d at 677. *See also Lewis*, 496 F.3d at 653 (grouping adverse employment actions into three categories).

In *Jones v. City of Chicago*, the court specifically considered under what circumstances a reassignment of job duties constitutes an adverse employment action. No. 21 C 137, 2023 WL 3479172, at *8-9 (N.D. Ill. May 16, 2023). The plaintiff in *Jones* was

transferred to a new team within the Narcotics Division of the Chicago Police Department after she submitted a complaint of gender discrimination against her prior team's sergeant. *Id.* Jones alleged that her reassignment to a new team amounted to an adverse employment action because she lost out on overtime[19] and suffered from the "stigma" of being dumped from her prior team. *Id.* at p. 9. The court reasoned that "[a] transfer does not become an adverse employment action solely because the employee subjectively prefers one position over another." *Id.* at p. 8 (citing *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625 (7th Cir. 2004)). Further, the court recognized that "[a] reassignment of job duties is not materially adverse unless it is a significant change that is often reflected by a corresponding change in work hours, compensation, or career prospects." *Robertson v. Department of Health Services*, 949 F.3d 371, 384 (7th Cir. 2020). Because Jones failed to come forward with evidence to suggest that her career prospects were damaged because of the reassignment, the court found that the reassignment did not amount to an adverse employment action.

---

[19]     In *Jones*, the court recognized that the loss of opportunity to work overtime can amount to an adverse employment action. 2023 WL 3479172, at *9 (citing *Galvan v. Community Unit School District No. #300*, 46 F. Supp. 3d 836, 841 (N.D. Ill. 2014) (stating that "[l]ost overtime is a materially adverse employment action only if the plaintiff shows that the overtime was a 'significant and recurring part of an employee's total earnings similar to a raise,' but not if the overtime opportunities were 'sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer' and thus akin to a 'discretionary bonus.'")). However, Jones did not come forward with any evidence to suggest that she would have made "significantly more overtime had she remained on her prior team. Further, Jones admitted that the opportunity for overtime depended on the nature of the investigation, making overtime pay "unpredictable and discretionary." *Id.* Thus, a difference in overtime pay was not considered an adverse employment action.

Like the plaintiff in *Jones*, Davé has failed to put forward any evidence to create a question of material fact as to whether the reassignment has negatively impacted his career. Davé clearly has a preference to teach classes that are within his field of expertise, which is understandable given his extensive experience with inorganic chemistry. However, he only alleges a vague adverse consequence in his initial complaint regarding his workload assignment stating that "he has been subject to harsher terms and conditions than other individuals employed by SIU." (Doc. 1, p. 6). The only other place Davé attempts to set out this argument is within his April 11, 2017, EEOC Complaint wherein he states that "deny[ing] him opportunities to teach within his academic specialty curtails any chance of career advancement." (Doc. 84, Exh. 50, p. 3). Aside from conclusory statements, however, Davé fails to point to anything in the record indicating how his workload assignment has negatively impacted his career trajectory. For example, there is no evidence indicating that he had been denied additional research grants or funding because he no longer teaches classes in inorganic chemistry. Because Davé failed to point out any such evidence, his Title VII claim regarding his workload assignment fails.

### 2.  *Title VII Retaliation Claim*

Next, the Court turns to Davé's Title VII retaliation claims. Title VII prohibits an employer from retaliating against an employee "because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing." *Igasaki*, 988 F.3d at 959 (quoting 42 U.S.C. § 2000e-3(a)). Like the Title VII discrimination claim, Davé may proceed under either the direct or indirect methods of proof. *See Castro*

*v. DeVry University, Inc.*, 786 F.3d 559, 564 (7ᵗʰ Cir. 2015) (collecting cases). Here, Davé appears to be making a case using the direct method. (Doc. 89, p. 18-19). Accordingly, to defeat summary judgment, Davé must offer evidence from which a reasonable jury could find: "(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).

### A.    *Whether Plaintiff Engaged in a Protected Activity*

"An employee engages in a protected activity by either: (1) filing a charge, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H&M Intern.*, 712 F.3d 1062, 1065 (7ᵗʰ Cir. 2013). To determine whether Davé's allegations constitute a protected activity, the Court must assess whether his complaints have actual merit and whether he invoked his protected class as a basis for his alleged harms.

With respect to the merits of Davé's complaints, the Seventh Circuit has consistently held that utterly baseless claims do not receive protection under Title VII. *See, e.g.*, *Fine v. Ryan International Airlines*, 305 F.3d 746, 752 (7ᵗʰ Cir. 2002) (holding that to win a retaliation claim, it is required that the employee "reasonably believed in good faith that the practice she opposed violated Title VII and that it "is improper to retaliate against anyone for claiming a violation of Title VII unless that claim is 'completely groundless.'"); *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7ᵗʰ Cir. 1996) (stating that it is "improper to retaliate for the filing of a claim of violation of Title VII even if the claim does not have

merit – provided it is not completely groundless. There is nothing wrong with disciplining an employee for filing frivolous complaints.") (internal citations omitted).

Davé's deposition is the only place within the record where he discusses the factual basis of his allegations of discrimination due to his race and national origin. (Doc. 84, Exh. 41, p. 33:14-36:5). Davé recounts prior interactions with former chairs of the chemistry department, including Gerard Smith, David Koster, and Lori Vermeulen. *Id.* Davé stated that Smith, Vermeulen, and Koster each made comments about his Indian accent. *Id.* at p. 34:14-21; 35:7-8. Davé, however, acknowledged that none of these individuals played any role in his termination as "they were no longer [at SIU]." *Id.* at p. 36:5. Further, Davé has not alleged that any of these individuals played a role in his missing property, workload assignments, or suspension without pay. Davé cannot impute the actions of these individuals to Defendant for subsequent discrete acts where they were not involved. Because these are the only allegations of racially motivated conduct in the record, Davé's claims of discrimination on the basis of race are groundless.

As for his age discrimination claim. Davé alleges that on April 29, 2016, in a meeting with then Department Chair Dr. Gary Kinsel that Kinsel advised him that "he was giving a preference to younger faculty members and would likely be reassigning them those inorganic chemistry courses" that had been previously taught by Davé. (Doc. 89, Exh. 9, p. 3-4). However, the course assignment that ultimately allegedly led to Davé's termination was made by Wang when she became Chair of the Department after Kinsel in August 2016. Davé has not pointed to any evidence in the record suggesting that the alterations made to his courseload assignments for Fall 2016 and Spring 2017 by Wang

were made with a spirit of discriminatory animus. In Wang's email to SIU Counsel Deborah Nelson, recounting the conversation that Wang had with Davé and Dr. Kohli in Panera Bread, Wang noted that she "made it crystal clear that the department cannot let him teach CHEM 410/CHEM 411 unless the current faculty who teaches these classes does not want to teach them or get tenure of promoted. Dr Davé agreed." (Doc. 84, Exh. 18, p. 1). Further, Wang stated in the same email that the objective of the conversation was to "show that we care[ed] about him and we want to help." *Id.* at p. 2. Wang suggested the alteration to the assignment from Kinsel to allow Davé adequate time to develop his own teaching materials for his new course load. *Id.* at p. 2 (stating that "[a]lso, I mentioned that we could drop Chem579 to give him time to recreate all the teaching materials."). Therefore, any claims about the assignments made by Wang being discriminatory in any manner are also baseless.

As to whether Davé actually invoked his protected class, vague and obscure "complaints" do not constitute a protected activity. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850-851 (7th Cir. 2008). Here, Davé has failed to invoke his protected class as the reason for the retaliation he experienced in his communication with the university administration. As such, those communications cannot be classified as a protected activity under the statute.

The majority of Davé's allegations fail to invoke his protected class as a reason for the retaliation thereby preventing him from claiming his complaints as a protected activity. While filing an official complaint with an employer may constitute a statutorily protected activity under Title VII, the complaint must indicate that the discrimination

occurred because of race, sex, national origin, or some other protected class. *See Skiba v. Illinois Central Railroad Company*, 884 F.3d 708, 718 (7th Cir. 2018). If an employee does not indicate that connection to the protected class, the employee needs to provide enough facts to infer that there is such a connection. *Id.* Otherwise, general complaints of discrimination or harassment do not constitute a protected activity sufficient for a retaliation claim. *See Cover v. OSF Healthcare System*, Case No. 3:18-cv-501114, 2023 WL 6541319, at *6-7 (N.D. Ill. Oct. 6, 2023) (reconsideration denied Case No. 3:18-cv-50114, 2023 WL 7220555 (N.D. Ill. Nov. 2, 2023) (citing *Skiba*, 884 F.3d at 718).

Davé's emails to the University administration, his union representative, and Chair Wang do not hint at discrimination based on age, race or national origin being an issue. (Doc. 89, Exh. 2, p. 82-93); (Doc. 84, Exh. 5-26). For instance, Davé's email to Dr. Achenbach sent on September 14, 2016, only states that "the grievance issue concerns workload assignments for the spring 2016, fall 2016, and spring 2017 semesters." (Doc. 89, Exh. 2, p. 90). Davé's email to Chair Wang on September 20, 2016, only states that his assignment "violat[es] the CBA, state laws, and federal statutes" without including any factual basis for the allegation. *Id.* at p. 85. Davé's 2017 communications are similar, only stating that "the assignment is in violation of university policies, CBA, state laws, and federal statutes." *Id.* at p. 87.

Davé's April 2017 EEOC Complaint is the only place where he sets out his claim for retaliation based on  age sufficient to meet the standard of a protected activity. (Doc. 84, Exh. 49, 50). Davé's April 2017 complaint states that he was denied the opportunity to teach within his academic specialty curtailing any chance of career advancement and that

similarly situated younger employees were not subjected to these unequal terms. (Doc. 84, Exh. 50, p. 4). Davé's November 2017 complaint alleges that he was discharged on June 5, 2017, and that he believes it was in retaliation for engaging in a protected activity only in violation of the ADEA. (Doc. 84, Exh. 49). Accordingly, only the April 2017 EEOC complaint amounts to a protected activity for purposes of his Title VII retaliation claim.

### B.       Whether Plaintiff Suffered an Adverse Employment Action

Next, Davé must establish that he suffered an adverse employment action. For a Title VII retaliation claim, a materially adverse action is defined as an action "that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Poullard v. McDonald*, 829 F.3d 844, 852 (7th Cir. 2016). This standard is easier to satisfy than the comparable standard for Title VII discrimination claims, which is "limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006). Even still, for retaliation claims, the actions must rise above trivial harms. *Id.* at p. 68. Context is key in distinguishing between material adverse actions and petty slights. *See Lesiv v. Illinois Central Railroad Company*, 39 F.4th 903, 911-912 (7th Cir. 2022).

Davé has not argued how his teaching assignments would chill him from complaining about the university's alleged misconduct. However, he seems to suggest that his suspension without pay and termination were done in retaliation for complaining about his workload assignments for Fall 2016 and Spring 2017. (Doc. 89, p. 19). The Court

agrees and believes that these actions amount to adverse employment actions under the Title VII retaliation provisions.

The Seventh Circuit has indicated that "all unpaid suspensions – regardless of length – may constitute adverse employment actions. *See Benuzzi v. Board of Education of City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011). Additionally, the fact that an employer subsequently pays the employee for the time of the suspension does not allow the employer to escape liability. *See, e.g.*, *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1113, 1121 (7th Cir. 2009) (noting that three-day unpaid suspension could support retaliation claim); *Appleton v. City of Gary, Indiana*, No. 19-1440, 781 Fed. Appx. 501, 504 (7th Cir. July 30, 2019) (stating that "Appleton's one day suspension and her reduction in hours could constitute an adverse employment action."); *Burlington Northern*, 548 U.S. at 73 (stating that "an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay."). Davé was put on unpaid leave on January 19, 2017, pending an investigation, in accordance with the CBA. (Doc. 84, Exh. 27). This constitutes an adverse employment action.

Davé's June 5, 2017, termination also qualifies as an adverse employment action. Termination may be considered an adverse employment action in the retaliation context. SIU argues that the time gaps between Davé's complaints to the University and EEOC prevent him from being able to establish a prima facie case of retaliation under Title VII. (Doc. 84, p. 21-22). SIU argues that "Plaintiff's March and August 2016 emails were sent more than a year" prior and his April 2017 EEOC claim merely perfected a December 2016 charge. *Id.* at p. 21. However, the Seventh Circuit has indicated that circumstantial

evidence of retaliation may be sufficient to overcome the time-gap presumption. *See, e.g.,*
*Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996) (recognizing that
summary judgment is inappropriate when the record would permit reasonable trier of
fact to conclude that the employer "waited in the weeds" for years looking for an
opportunity to fire the employee."). In this case, Davé filed the April 2017 EEOC
complaint about his suspension without pay two months before he was ultimately
terminated. While the time gap between the EEOC complaint and the discharge give the
Court pause, SIU's internal communications regarding his termination discussed below
overcome the time gap presumption.

### C.   Whether Plaintiff Can Establish "But-For" Causation

Plaintiff is finally required to demonstrate that "but for" his protected activity, he
would not have been subjected to the complained of adverse employment actions.
*University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). In a Title
VII claim, but-for causation is "established whenever a particular outcome would not
have happened 'but for' the purported cause.  In other words, a but-for test directs us to
change one thing at a time and see if the outcome changes. If it does, we have found a
but-for cause." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1738 (2020). Accordingly,
in this case, to establish the causal-link element, Plaintiff needs to establish that
Defendant would not have fired him had he not engaged in the protected activity. To
show causation, employees may point to circumstantial evidence, such as "suspicious
timing, ambiguous statements of animus, evidence of other employees who were treated
differently, or evidence the employer's proffered reasons for the adverse action were

pretextual." *Rozumalski v. W.F. Baird & Associates, Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019). Regardless of the type of evidence presented, "[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765-766 (7th Cir. 2016).

It would be impossible for Plaintiff's suspension discussed in his April 2017 EEOC complaint to be the but for cause of that same suspension. Accordingly, the Court will only analyze his termination and his assertion that Defendant's proffered reason for Plaintiff's termination was pretextual (Doc. 89, p. 14 – 18). Defendant SIU argues that they have articulated a legitimate reason for terminating his employment: "he refused to teach his assigned classes and he failed to show up and teach his classes." (Doc. 84, p. 16). In turn, Plaintiff asserts that SIU's repeated deviation from its employment policies, Dr. Moran's lack of qualification to teach Chemistry 410-411, and Dr. Kohli allegedly being instructed to inform Plaintiff that he was "off the hook" for teaching his assigned classes demonstrate pretext and call into question whether SIU's motives for terminating him are honest. (Doc. 89, p. 16). Plaintiff's allegations, however, are insufficient to establish that his April 2017 EEOC complaint was the but-for cause of his termination.

"Pretext is not "just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Burton v. Board of Regents of University of Wisconsin System*, 851 F.3d 690, 698 (7th Cir. 2017). Thus, "an inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Rozumalski, 937* F.3d at 927. To demonstrate pretext,

a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the [defendant's] stated reason[s] that would permit a reasonable person to conclude that the stated reason[s] [are] unworthy of credence." *Robertson v. Department of Health Services*, 949 F.3d 371, 380 (7th Cir. 2020). The record is clear that Plaintiff failed to show up to teach his classes in the Spring 2017 semester. However, Plaintiff believes that SIU essentially set him up in retaliation for filing the April 2017 EEOC complaint. Upon review of the record, however, all of the suspicious conduct Plaintiff points to occurred prior to his April 2017 EEOC compliant.[20] Logically, such suspicious conduct cannot be considered when evaluating whether Defendant's reasons for terminating him amounted to pretext.

Plaintiff first alleges that Dr. Kohli called him "a day or two" before the Spring 2017 semester in January and told him that he had been assigned to teach his courses – meaning that "he was off the hook" and wasn't required to teach them. According to Plaintiff, Kohli called him before the semester started and told him that Wang had instructed him to inform him of this news because Wang didn't "want to challenge DiLalla." (Doc. 89, Exh. 1, p. 8-9). Other evidence in the record is consistent with this conversation, including the fact that Wang's August 29th email outlined her desire to have Kohli teach the course. *See, e.g.*, (Doc. 89, Exh. 2, p. 88) ("Spring 2017: Chem 579 (hopefully you will have enough time to recreate the materials) [But I can only do so if I can find

---

[20]      When evaluating "but-for" causation, "the closer two events are, the more likely that the first caused the second. Adverse actions that "come [] *so close on the heels* of a protected act that an inference of causation is sensible." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (emphasis added).

someone to cover Chem106 . . . I am counting on Punit."]). Wang communicated with Dean Achenbach that she had planned for someone to teach Plaintiff's classes as Plaintiff had notified her that he would not teach them due to a lack of resources. (Doc. 89, Exh. 2, p. 92-93). In response, Achenbach replied to Wang and informed her "NOT to put a replacement into either course until Dr. Davé does not show up to class. Please see me asap to discuss." However, this plan was allegedly concocted before Plaintiff's EEOC complaint was filed in April 2017.

A similar argument precludes Davé's position as to SIU's alleged failure to follow the CBA. Davé argues that SIU's failure to follow the procedures laid out in the university's Collective Bargaining Agreement ("CBA") constitutes pretext. Section 8.2 of the CBA afforded Davé the right to file an internal grievance challenging his teaching assignments. Davé filed this grievance with Dr. Achenbach on September 14, 2016. (Doc. 89, Exh. 2, p. 90). Dean Achenbach forwarded Davé's grievance on to the University's General Counsel writing "And so it begins. How do you wish me to proceed?" *Id.* According to the CBA, "any such grievance shall be given priority in order to expedite resolution." (Doc. 89, Exh. 2, p. 118). Davé alleges that he never received a response back to this grievance in violation of the university's procedures. (Doc. 89, Exh. 1, p. 7). He also alleges that he never received any of the documentation that he requested in accordance with Section 6.09 of the CBA. *Id.* Despite this evidence, there simply is no connection between Davé's termination and SIU's alleged failure to comply with the CBA because it occurred nearly a year before Davé filed his April 2017 EEOC complaint. Because Davé has failed to establish "but-for" causation, his retaliation claim must fail.

2.     **ADEA claim**

SIU asserts that Davé has failed to state a claim under the ADEA because his "complaints and grievances do not relate to materially adverse employment actions." (Doc. 84, p. 24), Additionally, SIU believes that Davé cannot establish that a reasonable jury may conclude that "but for" Davé's age, he would not have been suspended pending an investigation and then discharged for failing to attend and teach his assigned classes. *Id.* Davé did not respond to SIU's arguments in his Response to Defendant's Motion for Summary Judgment. (Doc. 89).

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's age." 29 U.S.C. § 623(a)(1). As with Title VII, not everything that makes an employee unhappy is an adverse employment action under the ADEA – only actions that significantly alter the terms and conditions of an employee's job is an actionable adverse employment action under the ADEA. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). Davé must also establish that "but for" his age, he would not have been subjected to the complained of adverse employment action. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009). Direct and circumstantial evidence are relevant to this inquiry. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

The Court concludes that Davé's ADEA claims fail. Like his Title VII discrimination claim, Davé has failed to provide the Court with evidence that he has experienced an adverse employment action regarding his work assignments. *See supra* p.

27-33. *See also Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009) (applying the same adverse action standard to Title VII discrimination claim and ADEA claim). Additionally, as discussed above there is no evidence within the record that would allow a reasonable jury to conclude that but for his age Davé would not have been terminated. Davé simply did not teach his assigned classes and that was the reason why he was terminated.

### D.   SIU's Request for Reasonable Attorney's Fees

SIU seeks to recover its reasonable attorneys' fees (less what was already awarded as a sanction).[21] (Doc. 84, p. 26). SIU believes it should recover these fees because Davé's case was brought in bad faith, and his claims were "frivolous, unreasonable, or without foundation." *Id.* SIU notes that "[p]rior to plaintiff filing this lawsuit, and while this lawsuit was pending, Plaintiff was repeatedly informed – by his union, by outside neutrals, and by various courts – that is discrimination and retaliation claims lacked any merit whatsoever." *Id.* Davé disputes SIU's understanding of the case and argues that his Illinois Labor Relations Act claim was different than the one brought before this Court. (Doc. 89, p. 20). Although Davé's case was unsuccessful, the Court believes that it was not frivolous so as to warrant attorneys' fees. Thus, the Court denies SIU's request.

42 U.S.C. § 2000e-5(k) provides that "in any action or proceeding under this subchapter [of Title VII] the court, in its discretion, may allow the prevailing party, a

---

[21]   This Court awarded the University $8,244.82 as a sanction for Davé's repeated contumacious conduct during discovery. (Doc. 66); (Doc. 71).

reasonable attorney's fee (including expert fees) as part of the costs." In such cases, the prevailing defendant need only show that the claims were "frivolous, unreasonable, or without foundation." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-422 (1978). *See also Griffin v. St. Clair County, Illinois*, Case No. 3:17-cv-01169-JPG-RJD, 2019 WL 3738626, at *1 (S.D. Ill. Aug. 8, 2019) (awarding attorneys' fees in a Title VII action). Moreover, there is no bad faith requirement – the action simply must have been meritless or without foundation. *See Munson v. Milwaukee Bd. of School Directors*, 969 F.2d 266, 269 (7th Cir 1992).

Davé is correct that his Illinois Labor Relation Act claims are distinct from those brought under Title VII and the ADEA. Davé's November 22, 2019, Illinois Educational Labor Relations Board case addressed whether the Board of SIU violated Section 14 of the Illinois Educational Labor Relations Act by (1) failing to comply with the arbitrator's award relating to his assigned office and laboratory space; (2) retaliating and harassing him for participating in union activities; and (3) ignoring and interfering with the grievances he filed. (Doc. 84, Exh. 36, p. 2). Davé's February 21, 2020, Illinois Educational Labor Relations Board case addressed whether the Board erred when it dismissed his charges without holding an evidentiary hearing and whether the Board erred when it found that his claim that SIU violated the Act by failing to comply with the arbitrator's award was untimely. (Doc. 84, Exh. 37, p. 4). While the Court in both cases considered whether the Board abused its discretion by dismissing his charges[22], it did not conduct

---

[22]     The Court reviewed each of the decisions supplied in the record. The Court is aware that the Illinois Court found that "There is nothing in the record to show that SIU placed petitioner

an analysis under Title VII or the ADEA. Furthermore, as the above discussion demonstrates, there were certain elements of his claim that Davé arguably satisfied. Davé had the right to test his theory of the case against the standards of these federal statutes. Thus, the Court will not grant SIU reasonable attorneys' fees.

CONCLUSION

For the reasons delineated above, the Court **GRANTS** Defendant's Motion for Summary Judgment. (Doc. 83). The Court **DIRECTS** the Clerk of the Court to enter judgment reflecting the same and close the case.

**IT IS SO ORDERED.**

**DATED:  March 31, 2024.**

Gilbert C Sison
Digitally signed by Gilbert C Sison
Date: 2024.03.31 22:29:13 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**

---

on unpaid administrative leave or terminated him due to anything other than his refusal to appear for and teach his assigned courses." (Doc. 84, Exh. 37, p. 5).